UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
USDC-SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC#:
DATE FILED:  05/22/2015
```

FRES OQUENDO,

                    Oquendo,

        -against-

CCC TEREK, *d/b/a* Terek Box Event,

                    Defendant.

No. 14-CV-9835 (RA)

<u>OPINION & ORDER</u>

RONNIE ABRAMS, United States District Judge:

Plaintiff Fres Oquendo, a professional boxer, brings this state law action for breach of contract against Defendant CCC Terek, a German company that promotes prizefights. The parties' dispute centers around a bout for the World Boxing Association's ("WBA") world heavyweight championship held in Grozny, Chechnya on July 6, 2014. Oquendo lost the fight, which was promoted by Terek, to Ruslan Chagaev, an Uzbek boxer who now holds the WBA world heavyweight title. Oquendo claims that Terek did not pay him the full amount of the contracted $1 million purse and failed to schedule a rematch between him and Chagaev as Terek promised in the event Oquendo lost the bout. He seeks damages and injunctive relief. Terek's principal defense is that the contract is unenforceable.

The straightforward nature of the legal claims at issue belies the unusual, if not sensational, facts of this case. The underlying events began with a business meeting in Lima, Peru and ultimately resulted in a fight for the world heavyweight title watched by some 30,000 spectators in Grozny, which the parties agree was "one of the most extraordinary sights anybody has ever seen in the sport of boxing." Tr. 205. Indeed, one press account characterized the fight as "surreal" and described witnessing "folk singing, children dancing, an enormous psychedelic gazebo[,]

Chagaev wandering through a mock medieval [Chechen] village on his way to the ring," and personal intervention during the bout by Chechen president Ramzan Kadyrov.  Plf.'s Ex. 25; *see also* Plf.'s Ex. 35 (video recording of the fight).  The bout was not the only unconventional aspect of the case, which included references to the FBI and KGB, missing passports, and boxing promoters carrying $200,000 in cash and a firearm at a Chechen airport.

A consolidated preliminary injunction hearing and bench trial was held on April 2, April 3, and April 7, 2015.  The Court now finds for Oquendo on both claims.  Accordingly, Terek will be ordered pay damages of $775,000, together with interest at the prevailing statutory rate, and will be enjoined from promoting any bout for Chagaev within the next 18 months unless it first schedules the promised rematch.

## PROCEDURAL HISTORY

Oquendo, at the time proceeding *pro se*, commenced this action on December 12, 2014.  After Terek failed to answer or otherwise appear, the Clerk of Court issued a certificate of default and the Court signed an order on January 7, 2015 directing Terek to appear for a hearing on February 3, 2015 to show cause why a default judgment should not be entered against it.  Richard D. Simon, Esq. made an appearance on behalf of Terek the night before the scheduled default hearing, advising that he had only just been retained.

At the February 3 hearing, Terek stated its intention to file a motion to dismiss, and the Court set a briefing schedule for the motion.  A hearing on Oquendo's request for a preliminary injunction and Defendant's motion was scheduled for April 2, 2015.  After seeking an extension of the briefing schedule, Terek answered—instead of moving to dismiss—on March 2.  The same day, Oquendo retained Judd Burstein, Esq. and Peter B. Schalk, Esq. as counsel.

The Court held a status conference on March 5. At the conference, the parties agreed to a consolidated hearing on the preliminary injunction and bench trial, pursuant to Fed. R. Civ. P. 65(a)(2), which would begin the same day the hearing had originally been scheduled, April 2. The parties also agreed to an accelerated discovery schedule and further agreed that discovery would proceed informally. Terek, but not Oquendo, waived depositions.

On March 13, Terek requested that the hearing and trial on the merits be severed so it could have more time to assemble expert testimony concerning a failed drug test by Oquendo. Oquendo opposed that request because, *inter alia*, he was no longer challenging the results of the test. On March 16, the Court denied Terek's request for severance and referred this case to Magistrate Judge Francis for settlement and discovery management.

On March 23, as a result of alleged violations of Judge Francis' discovery orders, Oquendo moved before Judge Francis for sanctions under Fed. R. Civ. P. 37, asking that Terek's answer be stricken and that a default judgment be entered in favor of Oquendo. A hearing before Judge Francis on the motion was set for March 31.

The parties' joint pretrial order, proposed findings of fact and conclusions of law, and other pretrial materials were submitted on March 26. In accordance with the Court's customary practice for non-jury proceedings, the direct testimony of witnesses under a party's control were submitted via affidavit with the pretrial order. Oquendo submitted affidavits from five witnesses: himself, Robert Goodman, Dino Spencer, Tom Tsatas, and John Wirt. Terek submitted affidavits from Timur Dugazaev, its president, and Malte Müller-Michaelis, an individual with whom Terek had previously asserted it had no association.

On March 27, one day after Terek submitted its direct affidavits, Oquendo sought a conference with Judge Francis. He asked Judge Francis to direct Terek to either withdraw Müller-

Michaelis' affidavit or produce him for a deposition.  The same day, Judge Francis ordered "Mr. Michaelis [to] appear for [a] deposition on March 31, 2015, at a time agreed to between counsel, failing which he shall not testify at trial and his affidavit shall not be admitted." Dkt. 56.  Müller-Michaelis did not appear for his deposition.

On March 30, Terek wrote to the Court requesting an adjournment of Dugazaev's deposition, which had been previously scheduled for April 1 by agreement between the parties, and of the consolidated hearing and trial.  Terek argued the adjournments were necessary because Dugazaev "had taken ill with an infection and thus couldn't travel to New York for the deposition/trial" from Germany.  Def.'s Letter Mot., Dkt. 66.  The Court denied that request and ordered that Dugzaev's testimony would not be admitted if he failed to appear for the deposition at the agreed time. Dkt. 69.  Dugazaev did not appear for his deposition.

On April 1, the day after the hearing on Oquendo's motion for Rule 37 sanctions, Judge Francis issued his report and recommendation ("R&R").  Judge Francis concluded that Terek had failed to comply with the Court's discovery orders, that Terek's non-compliance was "plainly willful," and that "[g]iven the breadth of the defendant's noncompliance, [it was] doubtful that sanctions less severe than judgment by default would be effective."  R&R at 7, Dkt. 76.  In the alternative, Judge Francis suggested that in the course of trial, the Court might "be able to better identify specific issues as to which the plaintiff is prejudiced by Terek's conduct, and then tailor a more specific remedy by precluding evidence or drawing an adverse inference against the defendant."  *Id.* at 7–8.  Terek's objections and Oquendo's response were filed on April 16 after the consolidated hearing and bench trial.  In his response, Oquendo withdrew his request for default judgment in light of the fact that there had since been a full trial on the merits. Plf.'s Resp. to

4

Def.'s Obj. at 1, Dkt. 98.  He now asks for more narrowly tailored relief, which the Court will address in the course of the discussion that follows.  *See* n. 19, *infra*.

The consolidated hearing and bench trial was held on April 2, April 3, and April 7.  Neither Dugazaev's nor Müller-Michaelis' affidavits were admitted, since neither appeared for depositions, as noted above.  Terek elected to cross-examine all of Oquendo's witnesses save for Spencer.  Goodman was qualified as an expert witness, without objection.

At the conclusion of the trial, the Court issued a preliminary injunction prohibiting Terek from promoting any bout for Chagaev unless it first scheduled the promised rematch.  Dkt. 92. That injunction was subsequently clarified on April 24.  Dkt. 110.

On April 17, after statements by Dugazaev in the press threatening to commence litigation in Moscow relating to the parties' dispute, Oquendo moved for a temporary restraining order ("TRO").  At a conference held on April 24, the Court instructed Plaintiff to move by way of formal motion if he sought an anti-suit injunction.  Plaintiff did so, and the Court signed an order to show cause on April 29 and set a hearing date of May 7.  Dkt. 111.  The same day, the Court granted Simon's motion to withdraw as Terek's counsel for non-payment of fees.  Dkt. 114.

On May 6, one day before the scheduled hearing on Oquendo's motion for an anti-suit injunction, the Court received an emailed letter from Dugazaev through an intermediary.  *See* Letter from Timur Dugazaev, Dkt. 115, Ex. 1.  In the letter, Dugazaev requested a 30-day adjournment to afford Terek more time to find substitute counsel.  The same day, the Court granted Terek a seven-day adjournment until May 14 and issued a TRO barring Terek from bringing any litigation in Moscow related to this dispute.  Dkt. 115.  Terek failed to appear at the May 14 hearing and the Court converted the TRO to a preliminary injunction.  Dkt. 120.

On May 13, Oquendo moved for an order holding Terek in contempt for violating the preliminary injunction. The Court entered an order to show cause the same day, and a hearing was initially scheduled for May 21. Dkt. 116. That hearing has since been adjourned until June 4 on Oquendo's request. Dkt. 124.

As of the date of this opinion, Terek has yet to retain substitute counsel despite multiple admonitions to do so. Dkt. 114 & 115; *see also Jones v. Niagara Frontier Transp. Auth.*, 722 F.2d 20, 22 (2d Cir. 1983) ("The rule that a corporation may litigate only through a duly licensed attorney is venerable and widespread.").

## BACKGROUND[1]

### A.      The Parties

Oquendo, known in the industry as "Fast Fres" and the "Big O," is a 42-year-old man who began boxing in 1987. He turned professional in 1997 and has a record of 37 wins and eight losses with 24 of his wins coming by knockout. He has fought for world heavyweight titles on three occasions and is considered one of the top heavyweight fighters in the world, having competed against the likes of Evander Holyfield, James Toney, and Oliver McCall. In July 2014, Oquendo was rated No. 4 in the world by the WBA. Tr. 155; Oquendo Decl. ¶¶ 4–5; Plf.'s Ex. 4–5, 35. He is a U.S. citizen and a resident of Illinois. Oquendo Decl. ¶ 2.

During the events relevant here, Oquendo was surrounded by a bevy of advisors and agents. The most significant were John Wirt and Tom Tsatas. Wirt is the chief executive officer of Square Ring, Inc. ("SRI"), which acts as a promoter and agent for professional boxers, including Oquendo. He is also an attorney, having worked earlier in his career at the law firm now known as Sidley

---

[1] This opinion presents the Court's findings of fact and conclusions of law, as required by Fed. R. Civ. P. 52. The findings of fact appear principally in the Background section, but also appear in the Discussion section.

Austin LLP and served as in-house counsel to Don King Productions, Inc., a leading boxing promoter.  Wirt Decl. ¶ 1, 4, 11–13, 22, 27.  Tom Tsatas, who does not have a formal title, has been a friend and advisor to Oquendo for roughly 10 years and played a key role in negotiating the bout.  Tsatas Decl. ¶ 2; Tr. 235.  Oquendo was also represented at various times relevant to this action by Bobby Hitz, the president of Hitz Entertainment Corporation ("HEC"), and Lee Holliday, the principal of Lee Productions Co., LLC.  Plf.'s Ex. 11 at Bates No. 1860–65; Plf.'s Ex. 15.

Defendant Terek is a Hamburg, Germany-based company that promotes prizefights.  Timur Dugazaev, a former boxer himself, is the company's president.  Tsatas Decl. ¶ 2; Plf.'s Ex. 2, 13.  Because Dugazaev is not conversant in English, Malte Müller-Michaelis acted as Terek's authorized agent with regard to the bout at issue in this case.[2]  Tr. 196; Tsatas Decl. ¶ 4; Wirt Decl. 27–29; *see also* Plf.'s Ex. 7–10, 14, 16–23, 27, 36–38, 40.

## B.    Planning for the Oquendo-Chagaev Bout

### 1.    Initial Discussions Between Wirt and Müller-Michaelis

In or around October 2013, Wirt travelled to Lima, Peru to attend the WBA's 92nd Annual Convention with the goal of lobbying the organization to recognize Oquendo as the No. 1 contender for the WBA's then-vacant world heavyweight title and to have the WBA sanction a bout between Oquendo and Chagaev.  Wirt Decl. ¶ 7–8; Plf.'s Ex. 5.  The WBA is one of the four most influential sanctioning organizations in professional boxing.[3]  As part of its efforts to promote the sport of professional boxing, the organization sanctions certain matches as WBA title fights.  The winner of such a fight is recognized as the WBA world champion in the applicable weight

---

[2] Although Terek initially resisted characterizing Müller-Michaelis as an agent or representative of Terek, Terek conceded during the second day of trial that Müller-Michaelis had the authority to bind Terek.  Tr. 196.

[3] The others are the World Boxing Council ("WBC"), International Boxing Federation ("IBF"), and World Boxing Organization ("WBO").  Goodman Decl. ¶ 8.

class.  Such recognition yields sizeable financial benefits for a fighter as well as intangible benefits such as fame and the chance to make a mark on the history of the sport.  Oquendo Decl. ¶ 6; Goodman Decl. ¶¶ 8, 16.

In Lima, Wirt was approached by Müller-Michaelis, whom Wirt did not previously know. Müller-Michaelis informed Wirt that he was authorized to negotiate on behalf of the exclusive promoter of Chagaev, another highly ranked heavyweight professional boxer, to fight for the vacant WBA world heavyweight championship.  Wirt Decl. ¶ 9.  It is unclear whether Müller-Michaelis explicitly identified Terek by name.  Wirt proposed a purse of $1.4 million for Oquendo, which would have been divided between Oquendo and his promoters.[4]  Tr. 62, 144–45.  No agreement was reached in Lima and, on October 23, Wirt received an email from Müller-Michaelis advising Wirt that he had secured the WBA's sanction of a bout between Chagaev and Luis Ortiz, another boxer, for the heavyweight title.  Wirt Decl. ¶ 10; Plf.'s Ex. 6.  As Müller-Michaelis explained in that email, "I had to go with the best economical solution in order to protect the interests of the party I represented in Lima."  Plf.'s Ex. 6.

## 2.    Oquendo Proceeds Independently

By the late spring or early summer of 2014, Oquendo was of the view that his promotional agreement with SRI and HEC had concluded and that he was then a free agent.[5]  Accordingly, he undertook to secure fights on his own, with the assistance of Tsatas.  Oquendo Decl. ¶ 8.  At some

---

[4] Wirt testified that his intention was for SRI and HEC to take $500,000 as a promotional fee, leaving $900,000 for Oquendo.  Tr. 62.

[5] Oquendo's promotional agreement with SRI and HEC was valid for an initial term of 18 months beginning May 10, 2011, but included various provisions that extended its term.  *See* Plf.'s Ex. 11.  For example, the agreement was to be extended for a period of 12 months if Oquendo was ranked by the WBA or other recognized boxing organizations as being in the Top 10 in his weight class, as he eventually was.  The agreement also excluded from its term any period when Oquendo "was unable to compete due to injury or other cause."  As illustrated below, these various provisions created some uncertainty between Oquendo and SRI/HEC as to whether the promotional agreement was still in force at the time the Oquendo-Chagaev bout was scheduled.

point in May 2014, Müller-Michaelis reached out to Tsatas on behalf of Terek to negotiate terms for an Oquendo-Chagaev bout for the WBA heavyweight championship to occur in or around June 2014. Tsatas Decl. ¶ 3. Tsatas had never heard of Müller-Michaelis before, but relayed the offer to Oquendo. Tr. 290–91. Oquendo was "obviously interested." Oquendo Decl. ¶ 9. The parties began negotiating and, on May 9, Müller-Michaelis emailed Tsatas a proposed bout agreement. Plf.'s Ex. 7. It is unclear how Müller-Michaelis knew to contact Tsatas.

The parties ultimately reached an agreement dated May 10, 2014 pursuant to which Oquendo would fight Chagaev for the WBA world heavyweight title on June 7, 2014 in Grozny for a purse of $225,000 (the "May 10 Contract"). Plf.'s Ex. 8. A fully-executed copy of that contract—with Dugazaev's signature on behalf of Terek—was emailed to Tsatas by Müller-Michaelis on May 19, 2014. *Id.* For reasons that are unclear—and not relevant to the present dispute—Terek sought to change the date of the bout to July 6, 2014. A contract to that effect was memorialized on May 28, 2014 (the "May 28 Contract"). Def.'s Ex. E-52–56; Tr. 238. That second agreement states that Oquendo's purse is $75,000—apparently so the parties could avoid paying certain fees to the WBA—but there is no disagreement between the parties that Oquendo's purse at that time was understood to be an unchanged $225,000. Tr. 67–68, 233, 246, 239, 298, 396; Def.'s Ex. E-72–73.

Oquendo had been reluctant to move the fight to July 6 from June 7 because his wife was due to give birth to their child in late June or early July. His wife had complications with the birth of one of their older children and Oquendo was concerned that her current pregnancy might also prove to be challenging. Oquendo Decl. ¶¶ 15, 17. Tsatas had warned Müller-Michaelis of the risk of a bout so close to the baby's due date and the challenge it posed for Oquendo. Nevertheless,

both sides "hoped for the best."  Tr. 314.  The difficulty with the date notwithstanding, Oquendo was hopeful he could fight—and motivated by having a shot at the world title.

After the May 28 contract had been signed, Tsatas sought $10,000 for training expenses from Müller-Michaelis "due to the change of [the bout's] date," which would permit Oquendo to pay a sparring partner.  Tr. 299, 306–07, 315; Oquendo Decl. ¶ 18.  That amount was received by Oquendo via wire transfer on June 19.  *See* Plf.'s Ex. 26 (bank records).

### 3. The Birth of Oquendo's Child

In light of the complications Oquendo's wife had experienced in giving birth to her older child, her physicians recommended inducing labor around June 24, 2014.  Oquendo realized that this timing would allow him to be present for the birth of his child notwithstanding his commitment to fight Chagaev on July 6.  His wife's physicians induced labor on June 24, and the Oquendos' son was born the same day.  Oquendo Decl. ¶¶ 21–22.

By June 27, however, Oquendo's wife had become ill and was back in the hospital.  *See* Plf.'s Ex. 12 (medical records).  On June 28, Tsatas wrote to Müller-Michaelis: "Everything was perfect until yesterday.  I just pray his wife is ok."  Def.'s Ex. E-80.  His newborn son, too, became sick at approximately the same time and was admitted to the hospital.  Oquendo Decl. ¶ 25; Tr. 265.  Oquendo testified that his recollection of those days is weak because "[m]y world at that time was my family."  Tr. 178; *see also* Tr. 248.  As he also explained, his family situation took a toll on him because "boxing is [a] 90 percent mental sport."  Tr. 162.  In the days that followed, Oquendo relied heavily on Tstatas to manage his professional affairs.

The May 28 Contract, like the May 10 Contract, contained language permitting Oquendo not to proceed with the bout under certain circumstances, including where "a physician certifies that BOXER and/or OPPONENT is/are mentally or physically disabled to such an extent that one

or both cannot or should not participate in BOUT as scheduled." The contract provided that if a physician so certified, the parties would mutually agree whether to reschedule the bout within 90 days or terminate their agreement. Def.'s Ex. E-52–56, § 16 (May 28 Contract); *see also* Plf.'s Ex. 8 at Bates No. 4516–20, § 16 (May 10 Contract).

### 4.    SRI and HEC Sue Oquendo

At some point in May, Wirt learned of the arrangement between Terek and Oquendo and approached the WBA with his concern that Oquendo had gone around him in arranging the bout. Def.'s Ex. E-57; Tr. 58, 69. Müller-Michaelis was aware of Wirt's actions by May 20, when he emailed Tsatas seeking confirmation that Oquendo was a free agent because "John Wirt is trying to cause trouble." Def.'s Ex. E-57. Oquendo was copied on the message. Specifically, Wirt was seeking to have the WBA withhold its sanction of the bout. Tr. 323. Without the sanction, there would be no world heavyweight championship on the line—and little incentive for either fighter to proceed.

On June 20, SRI and HEC filed a lawsuit in the Circuit Court of Cook County, Illinois against Oquendo, Tsatas, and Holliday (the "Chicago action") alleging, among other things, breach of contract and tortious interference. *See* Plf.'s Ex. 11. The gravamen of the complaint was that the promotional agreements between Oquendo, on the one hand, and SRI and HEC, on the other, were still in effect, and that Oquendo was in breach by having gone around SRI and HEC to independently arrange the bout with Chagaev. SRI and HEC alleged—incorrectly, as it turns out— that "Oquendo, and others acting in concert with him, are to receive in excess of $1,400,000.00 for the championship Bout in Russia on July 6, 2014." *Id.*, Compl. ¶ 19. That amount, as noted above, was what Wirt had initially sought to negotiate when he had met Müller-Michaelis in Lima.

Oquendo did not learn of the Chicago action until June 24—the same day his son was born—when Wirt personally sent him a copy of the summons and complaint via email. Oquendo Decl. ¶ 24; Wirt Decl. ¶ 14; Plf.'s Ex. 11; Tr. 175. Müller-Michaelis and the WBA's legal counsel, among others, were copied on that message. Plf.'s Ex. 11. On June 30, with just a week before the bout, SRI and HEC filed an emergency motion for a TRO seeking, among other things, to bar Oquendo from participating in the bout with Chagaev. Wirt Decl. ¶ 15; Tsatas Decl. ¶ 16; Oquendo Decl. ¶ 24. The TRO was not granted, but a hearing on SRI and HEC's motion for a preliminary injunction was set for July 2. Tr. 82.

Tsatas, who had helped Oquendo negotiate the bout, was upset with Wirt and Hitz for initiating the Chicago action. Tr. 320–21. On June 28, he wrote to Müller-Michaelis to complain about how Wirt and Hitz were "strong arming you and us" and how he hoped that an attorney could "destroy these guys in court." Def.'s Ex. E-80.

### 5.     Oquendo Seeks To Quit the Bout

In the days immediately after the Chicago action was filed—and with the July 6 bout mere weeks away—Oquendo, Wirt, Tsatas, Holliday, and Müller-Michaelis began discussions in an attempt to resolve their differences. Oquendo Decl. ¶ 27; Wirt Decl. ¶ 16; Tsatas Decl. ¶ 17. Indeed, the same day that SRI and HEC filed for the TRO, Terek arranged for Wirt to fly to Moscow in an attempt to reach some resolution. Wirt Decl. ¶ 17; Tr. 79; Plf.'s Ex. 38 at Bates No. 2684. A letter dated June 30 from Dugazaev to Wirt states: "We will be happy to sit down with you and negotiate all pending matters regarding this fight. We apologize for any misunderstandings or miscommunication in the past." Plf.'s Ex. 13. Because Dugazaev spoke no English, Wirt expected he would be negotiating with Müller-Michaelis. Tr. 87, 103.

As Wirt arrived in Moscow, the parties confronted two discrete challenges.  First, there was the problem Oquendo and Tsatas had caused by going around SRI and HEC to arrange the bout directly with Terek through Müller-Michaelis.  Wirt had contacted Müller-Michaelis to seek $500,000 as a promotional fee for SRI and HEC, although he was prepared to negotiate.  Tr. 62–63, 83; Plf.'s Ex. 38 at Bates No. 1999–2001.  As Wirt testified, "[w]e wanted our rights respected."  Tr. 83.  In his view, Müller-Michaelis had "messed up" by going "directly to the fighter [on behalf of Terek], and that's what caused all these problems, ultimately."  Tr. 88.

Second—and more significantly, given his wife's and son's respective medical conditions—Oquendo had interrupted his training in order to care for his family and was now refusing to commit to the fight.  Tr. 160, 178–79.  A clearly worried Müller-Michaelis emailed Tsatas on June 30 to ask for an update on Oquendo's situation:

> Any news?  What's going on?  How is Fres' wife and how is the baby?
>
> We need to know exactly when you are coming to Moscow. I need you over there ASAP.  People are getting very nervous and don't think that you will fly over at all.  And now they start believing that I am fucking around with them.  This could really mean serious trouble for me.  And when I say serious I mean SERIOUS.

Def.'s Ex. E-37.  Tsatas replied less than an hour later saying that Oquendo's life was "a wreck," and that "[m]y hope and prayers are that tomorrow (Tuesday) the doctors give the ok she is good and he can go."  *Id.*  He reported that Oquendo hadn't "slept or worked out since Wednesday."  *Id.*

When Wirt arrived in Moscow on the morning of July 1, neither Müller-Michaelis nor anyone else from Terek would meet with him.  Wirt Decl. ¶ 18; Tr. 103–04.  With the bout now in question—since it was clear that Oquendo might bow out as a result of his family situation—Terek had little incentive to negotiate a deal with SRI and HEC.  A message from Müller-Michaelis sent that day states:

> John, at the moment we don't know when Fres will come to Moscow because of the pending health issues of his wife and baby. So right now there is no reason for any kind of negotiations with you. Once Fres and his team are on the plane I will make sure that we coordinate a meeting. Until that moment I have to ask you to stay in Moscow and wait for further instructions. Thank you.

Plf.'s Ex. 14.

At the same time, however, Müller-Michaelis was trying to get Oquendo to change his mind about staying with his family. As Wirt would later recall, he urged Müller-Michaelis in subsequent communication to consider "throw[ing] money at the problem." Tr. 96, 105. Müller-Michaelis then reached out on behalf of Terek to Holliday, Oquendo's manager, with an offer of a $1 million purse—up significantly from the $250,000 that had initially been agreed to in the May contracts. Oquendo Decl. ¶¶ 28–29; Tsatas Decl. ¶¶ 18–19.[6]

Oquendo and Tsatas were incredulous when they first heard about the million-dollar offer. On July 2, Holliday wrote to Müller-Michaelis to let him know that "They Think I'm making that $1 million U S Dollars offer up." Plf.'s Ex. 16. Müller-Michaelis replied two hours later: "This is to confirm that you didn't make it up. There is 1,000,000. – US$ (in words one million US Dollars) on the table if Fres gets on a plane tonight and arrives in Moscow tomorrow." *Id.* Müller-Michaelis also wrote directly to Tsatas: "[Oquendo] will return home with lots of $$$ in his pockets. They will turn him into a rich man." Plf.'s Ex. 37. In a subsequent reply on the first email thread, however, Müller-Michaelis warned the Oquendo team that Terek would not further increase the purse—this was their final offer. Plf.'s Ex. 40.

---

[6] Although Terek initially disputed who made the initial $1 million offer, it conceded the point midway through trial. *See* Def.'s Letter of April 6, 2015 at 1, Dkt. 83.

###### 6.      **Oquendo Refuses to Leave His Family**

Despite the million-dollar offer, Oquendo was still unwilling to leave his family.  And, in his view, he was within his rights to invoke the mental/physical condition clause of the May 28 Contract.  Oquendo Decl. ¶¶ 30–31.  With the prospect that Oquendo might refuse to participate in the July 6 bout growing, Müller-Michaelis' communications with Tsatas took a more urgent tone.  On July 2, the same day that the $1 million offer was made by Terek, Müller-Michaelis wrote to Tsatas to stress how serious the situation was:

> They have a signed contract with Fres and you.  And I was the one making the deal and giving my word that everything is working out. So if Fres really doesn't show up, you, Fres and I will have SERIOUS, SEEEEEEEEERIOUS problems.  This is not a small club show which you cancel last minute if somebody gets sick.  This is a major event which is broadcasted worldwide.

Plf.'s Ex. 17 at Bates No. 97.  Tsatas replied less than 20 minutes later, empathizing with Müller-Michaelis' dilemma and expressing his own frustration with Oquendo:

> I have done and will do EVERYTHING in my power to get him to go.  I have not TOLD him he MUST go or he will turn on me too and then there is NO WAY he will go.  I've tried slowly to get him to go … [but] I cannot put a gun to his head and make him go … I've invested half a million dollars in him for 10 years.  Believe me if ANYONE knows how it feels it's ME.

*Id.; see also* Tr. 312.  As Tsatas would later testify, "Knowing the way I know Fres, I didn't think he was going to fight, so I didn't, you know, [the purse] could have been $10 million at that point, I just don't think[,] his mind wasn't there."  Tr. 315.

A few hours later, Müller-Michaelis wrote to Tsatas again: "I told you thousand times that I understand the difficult situation he has been in with his wife and the baby."  Plf.'s Ex. 17 at Bates No. 96.  Nevertheless, Müller-Michaelis, added, ostensibly invoking the medical/physical disability clause of the May 28 Contract:

> [I]f you are not flying out today I need you to send me a certification
> from a doctor that Fres had a nervous breakdown or whatever and is
> not able and capable of flying.  How should I explain this to the
> promoter and to the government over there?  The guy just changed
> his mind?  YOU CANNOT CHANGE YOUR MIND when you sign
> a contract and people are putting down a lot of money to bring you
> to a fight.
>
> This will get really, really ugly for Fres, you and me.  IT'S INSANE!
> …

*Id.*

In the same message, presumably thinking that the Chicago action was also weighing on Oquendo's decision not to travel to Grozny, Müller-Michaelis urged Tsatas to "[f]orget about the stupid court case with John Wirt and his people."  *Id.*  What Müller-Michaelis appears not to have known, however, was that by that point, Wirt and Tsatas were working together.  As Wirt later recalled, "we have all kind of kissed and made up, we're all together, we are all in synch now."  Tr. 126.  Indeed, Tsatas forwarded the entire email chain to Wirt on July 2, less than 30 minutes later after he spoke with Müller-Michaelis.  He told Wirt:

> [Müller-Michaelis] sounds terrified and desperate and I'm
> concerned for your safety.  Try n call or get to the US Embassy.  I've
> also been told by Lee that former KGB agents will be looking for
> us.  [Pl]Ease do anything necessary to get to safety.

Plf.'s Ex. 17 at Bates No. 96.

Although Wirt did not take the threats seriously, Tr. 95, Tsatas later recalled that he was concerned because he considered Kadyrov, the Chechen president, "a serious operator," Tr. 305. He reached out to a friend at the Federal Bureau of Investigation to voice his concerns.  Tr. 317. But just about three hours after his panicked emails, Müller-Michaelis wrote to Tsatas again.  He expressed surprise that Tsatas had been scared by what he said earlier:

> Seriously, if I said or wrote anything which scared you, I am sorry. You have been my partner in this whole thing from day one. And I really don't want you to be uncomfortable.  I am very, very stressed because of the whole situation because people are getting nervous and nobody knows what's going on and I could not reach you or Fres or Lee [Holliday] or anybody.  But the FBI?  Wow!
>
> We are still talking about a boxing fight, right?  We are talking about a huge show and a very prestigious event but still we talking about sports and honoring contracts and agreements.  And nothing else.

Plf.'s Ex. 38 at Bates No. 4553.

When Wirt learned that Oquendo had refused the $1 million purse, he was shocked and thought Oquendo must have been "seriously messed up in his head" to have turned down so much money.  Tr. 97.  He decided to return to Chicago immediately to personally try to convince Oquendo to fly to Grozny.  Tr. 103.   SRI and HEC also withdrew the Chicago action the same day.  Tr. 97, 105–06.

In speaking with associates in the Russian boxing world over the course of the previous two days in Moscow, it had become clear to Wirt that the fight was much more important than an ordinary world title fight.  Tr. 98.  As he would later recall, "I've been involved in boxing now since 1993.  I've never seen anything like this before in my life.  Okay?  For a boxing event, I mean, it was over the top."  *Id.*; *see also* Tr. 108.

### 7. The Call from Ryabinsky and the Chechen President

At some point while Wirt was in Moscow, Andrey Ryabinsky, an important Russian boxing promoter known to Oquendo and Wirt, called Oquendo in an attempt to convince Oquendo to participate in the bout.  Tr. 143, 251.  Oquendo recalls Ryabinsky trying "to convince me that my safety and a million dollars [were] guaranteed."  Tr. 252.  Ryabinsky also committed to wiring $1

million to Wirt's account to guarantee payment by Terek.  Tr. 257.  It is unclear who, if anyone, encouraged Ryabinsky to make the call.  Tr. 143.

Chechen president Kaydrov was also on that call and spoke with Oquendo.  As Oquendo would later testify, "for a president to get on there and to guarantee my safety, you know, made me feel a little better."  Tr. 258.  Nonetheless, Oquendo did not make a firm commitment to appearing.  "I was staying with my family," he said.  Tr. 282; *see also* Tr. 254.  Oquendo understood that his failure to fight would mean that "the WBA would strip me of my world ranking, I would never get a chance to fight again, stuff like that."  Tr. 268.

### 8. Execution of the July Contract

Sometime on July 3, Wirt came up with the idea of a rematch clause.  In his mind, it solved both sides' problems.  Tr. 98–99.  It offered Oquendo insurance—if he lost as a result of his emotional condition, he would have another chance to redeem himself—and it offered Oquendo to Terek.  Wirt knew that it was crucial that the rematch not give Chagaev an opportunity to fight another opponent.  If Oquendo faced Chagaev only after Chagaev had fought other boxers, Oquendo was risking fighting someone who might have already lost the world heavyweight title— the element that made this bout especially significant to Oquendo in the first place.  Oquendo Decl. ¶¶ 36–37; Wirt Decl. ¶¶ 24–25; Tsatas Decl. ¶¶ 28.

Once back in Chicago, Wirt called Müller-Michaelis, who agreed to the rematch.[7]  Tr. 99. Such rematch clauses were not unheard of in the professional boxing world.  Tr. 41.  Wirt then drafted the agreement, which included the new $1 million purse and the rematch clause (the "July Contract").  Tr. 99.  Specifically, § 1 of the agreement provided: "Promoter shall pay Fighter a

---

[7] Wirt also testified that it was at this time that Müller-Michaelis promised SRI and HEC a promotional fee for "delivering" Oquendo.  Tr. 99.  The Court makes no finding as to that assertion.

purse of One Million U.S. Dollars (the 'Purse') via wire transfer to a bank account designated by Fighter upon completion of the Bout." The rematch clause in § 2 provided:

> In the event that Fighter does not win the Bout, the parties agree that Fighter and Opponent shall engage in an immediate rematch (the "Rematch"), without any intervening bouts of either Fighter or Opponent, for the WBA regular World Heavyweight Championship to be scheduled to take place within 120 days of the Bout to be promoted by Promoter at a site in Russia determined by Promoter on terms and conditions to be mutually agreed upon between the parties in good faith based on the then prevailing market value of the Rematch and the custom and practice in the boxing industry. Promoter shall cause the WBA to agree to this rematch clause.

The July Contract also included an integration clause, a forum-selection clause providing for jurisdiction in this Court, and a choice-of-law clause providing for New York law. *See* Plf.'s Ex. 39, §§ 3–4. The inclusion of those latter three clauses was deliberate on Wirt's part. Tr. 102, 109.

The contract was sent to Müller-Michaelis on the morning of the July 4. Tr. 99. At 2:49 p.m. the same day, an email from Terek's email address was sent to Wirt with the signed contract on behalf of the company. Plf.'s Ex. 19. The message's subject line was "Contract" and there was no text in the body of the email. At 3:19 p.m., the same document was again emailed to Wirt by Müller-Michaelis. Plf.'s Ex. 18. The subject line of that message read "Contract signed" and in the body of the message Müller-Michaelis instructed Wirt to "[p]lease call me as soon as you're boarding the plane so we know when to expect you in Grozny." *Id.*

Wirt still did not know, however, if Oquendo would agree to fight. Only after receiving the signed contract did Wirt reach out to Oquendo. He relied on Oquendo's brother Henry, whom Wirt understood Oquendo trusted deeply, to help persuade the fighter. Tr. 99. As Wirt later testified:

> [T]he way I sold Fres and his brother on the idea was, look, your wife's sick, you know, let's fly over there for two or three days and make the million—they've already offered you a million dollars.

> You'll never make this kind of money anywhere. You know, if you don't fight, you'll be taken out of the rankings, you'll be gone. I know you're messed up in your head and you shouldn't be fighting. Okay? It's like somebody dies in your family, you're grieving, you have a valid excuse.

Tr. 98. Wirt also forwarded the email message from Terek to Oquendo to assure him that Terek had, in fact, agreed to both the $1 million purse and the rematch clause. *See* Plf.'s Ex. 19. Finally, Wirt also told Oquendo that Ryabinsky was, as Oquendo testified, "pretty much putting his name on the line to guarantee just in case Terek Box, Timur [Dugazaev] don't pay on time." Tr. 251. Specifically, he told Oquendo that Ryabinsky had agreed to wire $1 million to Wirt to hold in escrow and that he had did, in fact, wired those funds to Wirt. Tr. 251, 259.

Oquendo changed his mind after the rematch clause was presented to him. Tr. 123, 255; Oquendo Decl. ¶ 38. He met Wirt at Chicago's O'Hare airport where he countersigned the agreement. Wirt Decl. ¶ 31; Oquendo Decl. ¶ 40. At 5:57 p.m. on July 4, Wirt sent the fully-executed contract to Müller-Michaelis. *See* Plf.'s Ex. 20. At Müller-Michaelis' request, Wirt sent him a photograph of Oquendo and his team at O'Hare at 5:55 p.m. Plf.'s Ex. 21. Two minutes later, Müller-Michaelis replied: "Thank you. Take another one when everybody's on the plane, please." Plf.'s Ex. 22. At 6:09 p.m., less than 15 minutes after the July Contract had been signed, Wirt emailed a photo of Oquendo and Tsatas seated on the plane, bound for Grozny via Warsaw. Plf.'s Ex. 23. As Wirt recalled, they "barely made that flight." Tr. 99.

## C.      The Bout

### 1.      Arrival in Grozny

Oquendo and his team, including Wirt, Tsatas, and trainer Dino Spencer, arrived in Grozny on July 5, just one day before the scheduled bout. Oquendo Decl. ¶42; Wirt Decl. ¶ 35; Tsatas Decl. ¶ 32. Upon arrival, they participated in the traditional weigh-in and other pre-fight activities

such as taping interviews and commercials.  The night before the fight, while in an elevator at the hotel, Spencer was approached by two unknown individuals who told him: "You think if you win you leave the country?"  Spencer Decl. ¶ 5.  Rattled, Spencer conveyed what had happened to Oquendo.  *Id.* ¶ 6.

### 2. Chagaev Defeats Oquendo

The bout occurred as scheduled on July 6.  According to those present, it was nothing short of spectacular—tantamount to a "mini-Olympics."  Tr. 98; *see also* Tr. 108, 205; Plf.'s Ex. 35 (video recording of the bout).  A seemingly packed stadium of some 30,000 spectators were greeted with fireworks and a light show accompanied by fog machines.  Oquendo and Chagaev were introduced to Imagine Dragons' "Battle Cry" from the "Transformers: Age of Extinction" soundtrack.  President Kadyrov gave a rousing speech.  Oquendo walked to the ring with an entourage that included Tsatas and Wirt.  Meanwhile, Chagaev strolled through a mock Chechen village, which included dancing children and soldiers with swords, before making his way to the ring, where Kadyrov greeted him with a hug.  After the U.S. and Russian national anthems, the bout proceeded for twelve rounds, with neither Chagaev nor Oquendo securing a knock out.  When Chagaev appeared to be flagging, Kaydrov personally walked up to the ring and to Chagaev's corner on at least two occasions.  As one reporter put it: "You really couldn't make this up without dropping a tab of acid first."  Plf.'s Ex. 25.

Chagaev secured victory by a narrow majority decision: one judge ruled the bout a draw at 114-114, while the other two found in favor of Chagaev by score of 113-115.  Plf.'s Ex. 25, 35; Oquendo Decl. ¶ 46.  Chagaev was lifted into the air by Kadyrov as fireworks erupted over the stadium.  Chagaev, Kadyrov, and Oquendo each spoke to the spectators afterward.  Oquendo thanked the crowd and said, "I want and hope that Ruslan Chagaev, a former champion and a

champion, will give me a rematch that's in my rematch clause."  Plf.'s Ex. 35 at 1:32:40.  As spectators began to leave, U2's "Beautiful Day" began playing.

## D.    The Aftermath of the Bout

### 1.    The Drug Test

After the fight, Oquendo asked to be taken to a hospital, where a brain scan was administered and he received some medical treatment.  After he was discharged, Oquendo, accompanied by Wirt and Spencer, asked to return to the hotel, but instead was driven back to the stadium.  There he was told to take a drug test administered by RUSADA, the Russian anti-doping agency.  He protested because he did not trust RUSADA's tests but ultimately relented.  Oquendo Direct. ¶¶ 48–49; Wirt Decl. ¶ 42; Spencer Decl. ¶ 7.

Oquendo would later learn from the WBA that he had tested positive for performance-enhancing substances.[8]  On December 3, 2014, the WBA suspended Oquendo for six months. Oquendo initially disputed what he calls a "false positive drug test."  Oquendo Decl. ¶ 49, n. 4. He appealed the suspension and then sought reconsideration of the WBA's denial of that appeal. Ultimately, in exchange for the WBA agreeing to make him eligible for ranking and participation in WBA-sanctioned bouts as of December 7, 2014, he withdrew his request for reconsideration. *See* Plf.'s Ex. 28.  As a result, he was suspended from the WBA only for the period from December 3 through December 6, 2014.

### 2.    The Airport

The next day, July 7, Oquendo and his team left for the Grozny airport as they prepared to return to the United States.  While their passports were taken, ostensibly so they could be stamped

---

[8] The record is not clear on what the alleged substances were.

by officials, Oquendo, Wirt, Tsatas, and Spencer were escorted to a room where they were met by Dugazaev and Müller-Michaelis. Müller-Michaelis urged Oquendo to accept $200,000 in cash, which he claimed to have brought with him in a black briefcase he was holding, in lieu of the $1 million purse. Dugazaev revealed that he was carrying a firearm. Oquendo refused and he and his team left the room. Tr. 87, 216–17, 297; Oquendo Decl. ¶ 50; Wirt Decl. ¶ 38; Spencer Decl. ¶ 8–9; Tsatas Decl. ¶ 38.

Upon leaving, Oquendo was informed that his and his team's passports had been "misplaced" and that there were no tickets for them to return home. Subsequently, however, his and Spencer's passports were located, although Tsatas' and Wirt's remained missing. At that point, Dugazaev and Müller-Michaelis urged Tsatas and Oquendo to accept a purse of $500,000. Neither Tsatas nor Oquendo agreed. Oquendo Decl. ¶ 51; Wirt Decl.¶ 39; Spencer Decl. ¶ 10; Tsatas Decl. ¶ 39.

Oquendo and Spencer were told to leave for the bus that would take them to the plane, but they refused to leave without Wirt and Tsatas. Eventually, Wirt's and Tstatas' passports were returned, although Tsatas never received a boarding pass. Wirt, who happened to have two boarding passes, gave one to Tsatas, allowing him "to basically sneak on the plane." Spencer Decl. ¶ 10; *see also* Plf.'s Ex. 24 (copy of handwritten boarding pass in Wirt's name used by Tsatas to board the plane). When the Oquendo team boarded the plane, all other passengers were already on board. Spencer sat next to Tsatas on the plane and recalled he was "sweating … and visibly shaken." Spencer Decl. ¶ 11. The plane took off soon thereafter. *See* Oquendo Decl. ¶ 52; Wirt Decl. ¶ 40; Tsatas Decl. ¶ 40.

### 3. The Purse

On July 21, 2014, Terek wired Oquendo $101,200 and, on July 23, 2014, a further $113,800, for a total amount of $215,000.  *See* Plf. Ex. 26 (bank records).  On July 23, Tsatas wrote to Müller-Michaelis to confirm that $215,000 had been received from Terek.  He added: "That leaves a remainder of $785,000. Please keep me informed on when they will transfer the rest." Plf.'s Ex. 27.  Müller-Michaelis replied a few hours later: "I will check on the rest and get back to you asap." *Id.*

Despite further demands, Terek has not paid Oquendo any additional funds.  Prior to July 23, 2014, there had been no dispute by Terek that Oquendo's purse was for $1 million.  Nor was there any suggestion by Terek's representatives that the July Contract was entered into out of fear, under threat, or as a result of another form of coercion.

At some point, Wirt returned the $1 million that Ryabinsky had wired to his escrow account upon Ryabinsky's demand.  Tr. 143.  Oquendo later recalled that "I was very upset at Wirt for doing that because I would not be here today if I would have got my money."  Tr. 259.

### 4. The Rematch

Despite Oquendo's requests, no rematch between he and Chagaev has been scheduled.  Rather, Terek has taken steps to facilitate other bouts.  On February 26, 2015, for example, Terek, acting on behalf of Chagaev, requested that the WBA grant a special permit for Chagaev to face Francisco Pianeta in Hamburg, Germany on April 25, 2015.  The WBA granted Terek's request on March 11, 2015, although the date of that fight has since been postponed.[9]

---

[9] Although not part of the trial record, Oquendo has since represented that the bout between Chagaev and Pianeta is to take place on July 11, 2015 in Magdeburg, Germany.  Decl. of John Wirt dated May 11, 2015, Dkt. 117.

In the aftermath of the bout, Terek did not raise Oquendo's positive test result as a basis for its refusal to pay the $1 million Oquendo sought or to schedule the rematch.  Nor does the record prior to the commencement of this litigation show Terek's providing any other reason for its refusal to do so.

## DISCUSSION

### A.    Overview

There is no dispute between the parties about how much was or was not paid to Oquendo and whether or not the rematch has occurred.  Everyone agrees that $225,000 was paid and that there has been no rematch.  The question of whether Terek is obligated to pay the balance of the $1 million purse and schedule a rematch turns largely on whether the July Contract was entered into under duress and is thus unenforceable, as Terek now contends.  There is also a related question as to whether the $10,000 paid to Oquendo in June represented an advance on this purse— regardless of whether it was $225,000 or $1 million—or whether it was in satisfaction of a separate promise for training expenses.  Terek also argues that this Court has no role to play in this dispute because the WBA has already decided the questions at issue here.  After discussing its jurisdiction, the Court addresses each of these issues in turn.

### B.    Jurisdiction and Venue

The Court is satisfied that it has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(a)(2) because this is a civil action between a citizen of a State and a citizen of a foreign state and involves an amount in controversy in excess of $75,000.  Personal jurisdiction and venue flow from the forum-selection clause contained in the July Contract, which provides that the parties irrevocably submit to the jurisdiction of this Court.  *See D.H. Blair & Co. v. Gottdiener*,

462 F.3d 95, 103 (2d Cir. 2006) ("Parties can consent to personal jurisdiction through forum-selection clauses in contractual agreements."); *Koninklijke Philips Electronics v. Digital Works, Inc.*, 358 F. Supp. 2d 328, 333 (S.D.N.Y. 2005) ("A valid forum selection clause establishes sufficient contacts with New York for purposes of jurisdiction and venue.").

Although Terek does not specifically challenge the validity or enforceability of the forum-selection clause, to the extent its general allegations of duress with respect to the July Contract can be construed as a challenge to the enforceability of the clause, such an argument cannot succeed. Allegations of duress with respect to the contract as a whole—or even to portions of it other than the forum-selection clause—are insufficient. *Haynsworth v. The Corp.*, 121 F.3d 956, 963 (5th Cir. 1997). Rather, the claims of duress "must be aimed straight at the [forum-selection] clause in order to succeed." *Id.*; *accord Composite Holdings v. Westinghouse Elec. Corp.*, 992 F. Supp. 367, 369 (S.D.N.Y. 1998). Even assuming, however, that Terek was making an argument directed at the forum-selection clause, that argument fails, essentially for the reasons that follow.[10] The forum-selection clause is thus enforceable.

## C.    The Enforceability of the July Contract

Terek appears to make two arguments in support of its assertion that the July Contract is unenforceable.[11] First, Terek argues that the contract is voidable as the product of economic

---

[10] Although federal courts will normally apply the body of law selected in the forum-selection clause in interpreting it, "federal law should be used to determine whether an otherwise mandatory and applicable forum clause is *enforceable* under *Bremen*." *Martinez v. Bloomberg LP*, 740 F.3d 211, 217 (2d Cir. 2014) (emphasis in original). A federal court will decline to enforce a forum-selection clause, *inter alia*, if "its incorporation was the result of fraud or overreaching," *id.* at 228, which is understood to include duress, *see, e.g.*, *Nat'l Sch. Reporting Servs., Inc. v. Nat'l Sch. of Cal., Ltd.*, 924 F. Supp. 21, 24 (S.D.N.Y. 1996). The party resisting enforcement on these grounds bears a "heavy burden of proof." *M/S Bremen v. Zapata Off–Shore Co.*, 407 U.S. 1, 17 (1972). Here, however, any argument of duress with respect to the forum-selection clause fails essentially for the reasons articulated in the Court's discussion of duress under New York law.

[11] The parties agree that Terek's duress arguments are governed by New York law. *See* Def.'s Mem. of Law at 2–3, Dkt. 51; Plf.'s Letter of April 6, 2015 at 2–4, Dkt. 82.

duress.  Second, it argues that it was under duress as a result of threats to its agents' physical safety by unnamed Chechen government officials.  Neither of these arguments is tenable.  And even assuming one or both succeeded on these facts, Terek's failure to promptly repudiate the contract is fatal to its assertion that the contract is now unenforceable.

### 1.    Terek Has Not Established Economic Duress

"The doctrine of economic duress arises from the theory that the courts will not enforce an agreement in which one party has unjustly taken advantage of the economic necessities of another and thereby threatened to do an unlawful injury."  *VKK Corp. v. Nat'l Football League*, 244 F.3d 114, 122 (2d Cir. 2001) (quotation omitted).  "A party seeking to avoid a contract because of economic duress shoulders a heavy burden."  *Orix Credit Alliance, Inc. v. Bell Realty, Inc.*, No. 93-CV-4949, 1995 WL 505891, at *3 (S.D.N.Y. Aug. 23, 1995) (*quoting Int'l Halliwell Mines v. Cont'l Copper & Steel Indus.*, 544 F.2d 105, 108 (2d Cir. 1976)).  Specifically, Terek must show that the July Contract was secured "(1) by means of wrongful threat precluding the exercise of free will; (2) under the press of financial circumstances; (3) where circumstances permitted no other alternative."  *Nicholas v. Nynex, Inc.*, 929 F. Supp. 727, 732 (S.D.N.Y. 1996) (quotation omitted); *accord Kamerman v. Steinberg*, 891 F.2d 424, 431 (2d Cir. 1989).  Terek's argument stumbles at each stage.

First, Terek cannot establish that Oquendo made any wrongful threat, which is "a key element in this analysis."  *Orient Shipping Rotterdam B.V. v. Hugo Neu & Sons, Inc.*, 918 F. Supp. 806, 812 (S.D.N.Y. 1996).  "Under New York law, threats to enforce a party's legal rights under a contract—or even that party's *interpretation* of its rights—cannot constitute a wrongful threat sufficient to establish a claim of economic duress."  *Cooper Dev. Co. v. Friedman*, No. 92-CIV-7572 (JSM), 1994 WL 62846, at *4 (S.D.N.Y. Feb. 22, 1994) *aff'd sub nom. Cooper Dev. v.*

*Friedman*, 43 F.3d 1458 (2d Cir. 1994) (emphasis in original). There is no disagreement that Oquendo was entitled under the May 28 Contract to withdraw from the bout if he was "mentally or physically disabled." Terek has not disputed that Oquendo's claims concerning the impact that the health of his wife and son had on him, if accepted as true, so qualify and the Court accepts Oquendo's assertions as credible. The absence of a wrongful threat is thus fatal to Terek's economic duress claim. Even assuming, however, that Oquendo's refusal to participate in the bout—for whatever reason—amounted to a threatened breach of the May 28 Contract, "[a] threatened breach of contract for which there are adequate legal remedies does not constitute duress." *Neuman v. Pike*, 591 F.2d 191, 194 (2d Cir. 1979). Terek has adduced no evidence that permits the conclusion that its remedies would have been inadequate.

Second, even supposing there was a wrongful threat, there is an absence of any meaningful proof concerning Terek's financial circumstances. For example, although Müller-Michaelis made general statements about the financial significance of the bout, Terek has not adduced any evidence concerning the costs it incurred in promoting the bout or its anticipated losses had Oquendo failed to appear. If anything, Terek appears to have conceded that it incurred few expenses in promoting the bout and, indeed, that it "didn't expend the funds to underwrite the event," as these costs were apparently covered by the Chechen government. Def.'s Obj. to R&R at 4, Dkt. 97. In any event, "the mere existence of economic pressure does not constitute duress." *Cont'l Airlines, Inc. v. Lelakis*, 943 F.Supp. 300, 307 (S.D.N.Y. 1996). It was Terek's burden to introduce concrete evidence concerning its financial circumstances and it has failed to do so.

Finally, it is not at all clear that Oquendo's absence was actually fatal to the bout. Indeed, on July 1, just three days before the contract was signed, Müller-Michaelis wrote to Tsdatas stating that "[i]f … Fres is not on the plane tonight with arrival in Moscow tomorrow I will have to go

with plan B which means that Fres is out of the fight." Plf.'s Ex. 38 at Bates No. 4559. Accepting this communication at face value—especially since Müller-Michaelis chose not to appear to provide any other explanation—Terek was apparently able to proceed without Oquendo. The prospect of an alternative fatally undercuts Terek's argument, and accordingly, Terek's claim of economic duress fails for this reason as well.

### 2.      Terek Has Not Established Physical Duress by Chechen Officials

Terek next argues that the contract is unenforceable because it was signed while its agents were under the threat of physical danger from unnamed Chechen government officials. In order to make out this defense, Terek must show: "(1) a threat, (2) which was unlawfully made, (3) caused involuntary acceptance of contract terms, (4) and the circumstances permitted no alternative." *Wolfson v. Wolfson*, No. 03-CV-0954 (RCC), 2004 WL 224508, at *6 (S.D.N.Y. Feb. 5, 2004). Here, the evidence before the Court does not support Terek's claim that its agents involuntarily assented to the July Contract. The Court does not ignore Müller-Michaelis' email correspondence to Tsatas expressing how "serious" and "ugly" things would get for Müller-Michaelis—and Oquendo and Tsatas—should Oquendo fail to appear for the bout. Nor does the Court disregard Tsatas' testimony concerning how he personally interpreted those messages. Even taking these statements at face value, however, the difficulty for Terek's argument is that Müller-Michaelis himself chastised Tsatas for overreacting to his earlier non-specific concerns. As he said only hours afterward, "[I]f I said or wrote anything that scared you, I am sorry … We are still talking about a boxing fight, right?" Plf.'s Ex. 38 at Bates No. 4553. These contradictory assertions undercut Terek's claim that whatever pressure existed—even assuming it amounted to an unlawful threat—resulted in its involuntary acceptance of the July Contract.

In any event, under New York law, "[d]uress by other than the opposing party to a contract cannot constitute compulsion sufficient to void the contract," *Evans v. Waldorf-Astoria Corp.*, 827 F. Supp. 911, 914 (E.D.N.Y. 1993) *aff'd*, 33 F.3d 49 (2d Cir. 1994), although there is an exception when the promisee had knowledge of or consented to the third party's actions, *see* 22 N.Y. Jur. 2d Contracts § 131.[12]  While the Court accepts that Oquendo and his team likely knew that Müller-Michaelis was, indeed, under pressure to ensure Oquendo appeared for the fight, the record simply does not permit the required conclusion that his camp knew of or consented to threats of physical force by unknown Chechen officials.  In plain terms, because the basic facts underlying Terek's third-party duress claim are essentially all speculation, this argument cannot succeed.

### 3.      Even Assuming Duress, Terek Ratified The July Contract

Even assuming, however, that Terek or its agents assented to the contract under duress, Terek cannot now invoke such compulsion to render the contract unenforceable.  Under New York law, "the person claiming duress must act promptly to repudiate the contract or release or he will be deemed to have waived his right to do so."  *VKK Corp.*, 244 F.3d at 122 (*quoting DiRose v. PK Mgmt. Corp.*, 691 F.2d 628, 633–34 (2d Cir. 1982)); *accord Cappelli Enterprises, Inc. v. F & J Cont'l Food Corp.*, 16 A.D.3d 609, 610 (N.Y. App. Div. 2d Dep't 2005).  "A party may ratify a contract or release entered into under duress by 'intentionally accepting benefits under the contract,' by 'remaining silent or acquiescing in the contract for a period of time after he has the opportunity to avoid it,' or by 'acting upon it, performing under it, or affirmatively acknowledging

---

[12] The Restatement (Second) of Contracts (1981) reverses the order of these propositions, providing that the general rule is that if a party's assent is induced under duress from a third party, the contract is voidable by the victim unless "the other party has, in good faith and without reason to know of the duress, given value or changed his position materially in reliance on the transaction." § 175.  The Second Circuit recently relied on this formulation in an unpublished opinion.  *See Aylaian v. Town of Huntington*, 459 F. App'x 25, 27 (2d Cir. 2012).  Even under this approach, however, Terek's argument cannot succeed for the reasons discussed.

it.'"  *VKK Corp.*, 244 F.3d at 123 (*quoting In re Boston Shipyard Corp.*, 886 F.2d 451, 455 (1st

Cir. 1989)).

Significant for present purposes, the burden on the party seeking to avoid its contractual

obligations "increases proportionately with the delay in initiating suit or otherwise repudiating the

contract in question." *Id.* (*quoting Int'l Halliwell Mines*, 544 F.2d at 108).  As the Second Circuit

has explained, the requirement that the party seeking to avoid its contractual responsibilities

promptly repudiate a contract is based on common sense and fairness:

> The requirement that the party claiming duress disclaim the contract
> or release about which he is complaining promptly or be held to have
> forfeited his right to do so protects the stability and reliability of
> such agreements by denying the weaker party the "heads I win, tails
> you lose" option of waiting to see how the arrangement works out
> and then deciding whether to seek to undo it … [T]he requirement
> of prompt disavowal after execution is fair to the disadvantaged
> party, who will ordinarily know at the time he executes the
> instrument that he is being economically [or physically] coerced.
> He will therefore be able to disclaim the instrument immediately if
> he was forced into it by economic [or physical] duress and wishes
> to avoid its effect.

*Id.* at 123–24.

The record here establishes that not only did Terek accept the benefits of the July Contract,

it made no attempt at prompt protest.  Indeed, the only evidence before the Court concerning

discussions about the contract after it was signed suggest that Terek understood it was enforceable.

Dugazaev and Müller-Michaelis attempted to persuade Oquendo to accept $200,000 and then

$500,000 in cash at the airport in Grozny.  These requests for forbearance make little sense if Terek

did not believe it was bound by the terms of the July Contract to pay Oquendo a $1 million purse.

Even assuming that what happened at the airport was ambiguous as to Terek's view on the

enforceability of the contract, the July 23 communication resolves such doubt.  When Tsatas wrote

to Müller-Michaelis on July 23 inquiring as to the status of the balance amount due on the purse,

Müller-Michaelis replied: "I will check on the rest and get back to you asap." Plf.'s Ex. 27. That statement cannot fairly be construed as a protest to the July Contract. Terek has adduced no evidence whatsoever that it objected to the July Contract as unenforceable as the product of duress until it appeared in this litigation—some eight months after the bout. That is simply too long and, accordingly, Terek must be held to its promise. *See VKK Corp.*, 244 F.3d at 123 ("Delays as short as six months have been held to constitute a forfeiture of a duress claim.") (*citing DiRose*, 691 F.2d at 634 (collecting cases where delays ranging from six months to two years constituted forfeiture)).

### D.  Terek Breached the July Contract

Terek concedes that if the Court finds the July Contract valid and enforceable—as the Court does—the May 28 Contract is superseded by virtue of the July Contract's integration clause and is thus no longer enforceable. *See* Def.'s Letter of April 6, 2015 at 2, Dkt. 83.[13] Accordingly, the question before the Court is whether Terek breached the July Contract. The parties agree New York law governs the July Contract by virtue of its choice of law clause and, in any event, it is the policy of New York courts, with exceptions not relevant here, to enforce that choice. *Finucane v. Interior Const. Corp.*, 264 A.D.2d 618, 620 (N.Y. App. Div. 1st Dep't 1999); *see also Schiavone Const. Co. v. City of New York*, 99 F.3d 546, 548 (2d Cir. 1996).

Under New York law, there are four elements to a breach of contract claim: "(1) the existence of a contract between itself and that defendant; (2) performance of the plaintiff's obligations under the contract; (3) breach of the contract by that defendant; and (4) damages to the

---

[13] The May 28 Contract's being superseded by the July Contract also moots the question of whether one or both parties breached the earlier contract. In light of that fact, the Court finds it unnecessary to further consider arguments about such alleged breaches. In particular, the Court need not consider Terek's argument that "[p]ursuant to plaintiff's May/June bout agreements, the failed drug-test resulted in his forfeiture of his purse." Def.'s Prop. Findings of Fact/Concl. of Law ¶ 9, Dkt. 52.

plaintiff caused by that defendant's breach." *Diesel Props S.r.l. v. Greystone Bus. Credit II LLC*, 631 F.3d 42, 52 (2d Cir. 2011). Oquendo has met his burden of establishing each of these four elements on the preponderance of the evidence.

The first three elements require little discussion. With respect to the existence of the contract, Terek conceded at trial that it entered into the July Contract, and argued only—and unpersuasively—that the contract was unenforceable as a result of duress. With respect to Oquendo's performance, there is no question that he fought in the July 6 bout or that he otherwise adequately performed his obligations under the contract, as evidenced by the fact of Terek's payment of $215,000 in the weeks after the bout.[14] Finally, with respect to breach, there is no dispute that Oquendo has not been paid $1 million and that no rematch has been scheduled. More to the point, Terek's request for the WBA to sanction a bout between Chagaev and Pianeta is sufficient to conclude that it has no intention of complying with its obligation to work in good faith to schedule such a rematch.

With respect to damages and the balance due with respect to the Oquendo's purse, some elaboration is necessary. Although the parties do not dispute that Terek has paid $225,000 to date, they do dispute what those payments represent. *See, e.g.*, Tr. 170, 279–80, 301. In particular, Oquendo claims that $10,000 of the amount paid reflects satisfaction of a separate agreement made with Müller-Michaelis subsequent to the May 28 Contract to compensate him for training expenses. In contrast, Terek appears to argue that no separate agreement was ever reached and that, in any event, the July Contract supersedes the parties' prior understandings such that the $10,000 reflects an advance on Oquendo's purse.

---

[14] Terek has not argued that Oquendo was in breach of the July Contract as a result of the positive drug test. *See also* n. 13, *supra*.

The dispute is resolved by recourse to the plain terms of the July Contract. Most significantly, it makes no reference to any provision for Oquendo's training expenses. The contract also includes a robust integration clause—which, as noted above, was deliberately inserted by Wirt—providing that the document "sets forth the entire understanding and agreement of the parties hereto regarding the subject matter hereof, and supersedes all prior agreements, statements, negotiations and understandings (whether written or oral, express or implied) regarding the Bout." § 4.[15] There is nothing ambiguous about any of these terms.

New York courts interpret integration clauses "to require full application of the parol evidence rule in order to bar the introduction of extrinsic evidence to vary or contradict the terms of the writing." *Primex Int'l Corp. v. Wal-Mart Stores, Inc.*, 89 N.Y.2d 594, 599 (N.Y. 1997). That is, where a "contract is clear and unambiguous on its face, the intent of the parties must be gleaned from within the four corners of the instrument, and not from extrinsic evidence." *RJE Corp. v. Northville Indus. Corp.*, 329 F.3d 310, 314 (2d Cir. 2003) (*citing De Luca v. De Luca*, 300 A.D.2d 342, 342 (N.Y. App. Div. 2d Dep't 2002)).

The July Contract reflects the parties' intent that it be the final word on their agreement concerning "the Bout." And there can be no serious dispute that the purported earlier agreement concerns that very subject matter. Indeed, Oquendo makes no argument to the contrary. Because Oquendo and Terek "[have] set down their agreement in a clear, complete document, their writing should as a rule be enforced according to its terms." *W.W.W. Assoc., Inc. v. Giancontieri*, 77 N.Y.2d 157, 162 (N.Y. 1990). Accordingly, the Court declines to consider evidence with respect to a separate agreement concerning $10,000 in training expenses.

---

[15] The "Bout" in turn is defined as "a bout at Grozny, Russia on July 6, 2014 between [Oquendo] and Ruslan Chagaev ('Opponent') for 12 rounds to a decision for the WBA regular World Heavyweight Championship." § 1.

34

As a result of Terek's breach of the July Contract, Oquendo is thus entitled to an award of $775,000 reflecting the balance owed with respect to his purse—that is, $1 million less the $225,000 already paid—together with interest from July 7, 2014 through the date of judgment at the statutory rate of 9 percent.  *See* N.Y. C.P.L.R. §§ 5001–5004.  The only question that remains is what relief, if any, is appropriate with respect to Terek's failure to schedule the rematch.

**E.      Oquendo Is Entitled to Damages and Injunctive Relief On the Rematch Clause**

**1.      The Rematch Clause is Enforceable**

A threshold issue in determining the appropriateness of injunctive relief is whether the rematch clause is enforceable notwithstanding the fact that the clause contemplates a subsequent agreement in that it does not provide for a purse amount.  The Court is satisfied that the absence of a price term is not fatal to the provision's enforceability.

First, New York law is clear that where a contract is complete on its face, but contemplates the negotiation of a subsequent related contract, the first contract is not an unenforceable "agreement to agree."  Rather, the negotiation of the future contract is merely a condition precedent that "must occur before a party is obliged to perform a promise made pursuant to an existing contract, a situation to be distinguished conceptually from a condition precedent to the formation or existence of the contract itself."  *IDT Corp. v. Tyco Grp.*, 13 N.Y.3d 209, 214 (N.Y. 2009) (*quoting Oppenheimer & Co. v. Oppenheim, Appel, Dixon & Co.*, 86 N.Y.2d 685, 690 (1995)).

Second, even where a contract contains a missing price term requiring additional negotiation, the agreement will be enforced if the missing term can be "supplied by a finding of the trial court based on proof of established custom and practice in the industry."  *Metro-Goldwyn-Mayer, Inc. v. Scheider*, 40 N.Y.2d 1069, 1070 (N.Y. 1976); *see also* Restatement (Second) of Contracts § 204 (1981); 1-4 Corbin on Contracts § 4.1 (Lexis 2015).  Here, the testimony of

Oquendo's expert witness, Robert Goodman,[16] established that industry custom and practice provided for a purse of $250,000 for a world heavyweight challenger unless the parties agreed otherwise.  The rematch clause is thus enforceable under New York law.

### 2.   Injunctive Relief is Appropriate

In order to secure injunctive relief, Oquendo must show: "(1) that [he] has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between [he and Terek], a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction."  *S.E.C. v. Citigroup Global Mkts., Inc.*, 752 F.3d 285, 296 (2d Cir. 2014) (*quoting eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006)).

"The Court has broad discretion to fashion injunctive relief."  *Beastie Boys v. Monster Energy Co.*, ___ F.Supp.3d ___, No. 12-CV-6065 (PAE), 2015 WL 736029, at *6 (S.D.N.Y. Feb. 20, 2015).  "However, injunctive relief should be narrowly tailored to fit specific legal violations and should not impose unnecessary burdens on lawful activity."  *Id.* (internal quotation marks, citation, and alteration omitted).  Here, injunctive relief that bars Terek from promoting any bout in which Chagaev is a participant, or transferring or assigning its rights to do so, until it promotes the promised rematch is appropriate.

Most significantly, the record is clear that Oquendo would suffer irreparable harm that cannot be remedied by money damages if he is denied a rematch.  No one disputes that, for a professional boxer, "[i]t is almost impossible to overstate the importance of the Heavyweight Championship from a major organization such as the WBA."  Goodman Decl. ¶ 16; *see also Lewis*

---

[16] Terek's counsel described Goodman as "one of the most respected, almost legendary figures in the boxing world."  Tr. 30.

*v. Rahman*, 147 F. Supp. 2d 225, 232 (S.D.N.Y. 2001) ("The opportunity to fight for the heavyweight championship … cannot be measured in money.")  There is, most notably, the chance of the intangible reward of a place in boxing history.  With its boxers of immense size and power, the heavyweight championship is unique among all weight classes in producing fighters that are the stuff of boxing legend.  Goodman Decl. ¶ 16.  But there are also the incalculable financial rewards that will flow to Oquendo should he become the champion.  *See Lakedreams v. Taylor*, 932 F.2d 1103, 1109 (5th Cir. 1991) ("[W]hen economic rights are especially difficult to calculate, a finding of irreparable harm may be appropriate.").  These rewards would be especially lucrative for Oquendo, because Americans have not fared well in heavyweight boxing over the last decade.  Goodman Decl.  ¶ 17.

Then there is also the issue of Oquendo's age.  A professional fighter has a "short economic life expectancy," *Williams v. McCarthy*, 67 N.Y.S.2d 763, 765 (N.Y. Sup. Ct. 1946), and at 42, the window for Oquendo to compete professionally may soon close.  Indeed, in *Lewis*, Judge Cedarbaum of this Court noted that Lennox Lewis' age of 35 was highly significant because "his boxing abilities may diminish" within the next two years.  147 F. Supp. 2d at 237.  Having only just been narrowly defeated by the reigning world heavyweight champion, Oquendo is obviously still able to compete at the highest levels—but that skill will not last forever.  His age thus militates in favor of injunctive relief.

The balance of hardships also tips decidedly in Oquendo's favor.  Unlike *Lewis*, where the court was confronted with the balance of hardships between two boxers—each of whom had their careers on the line—this case asks the Court to weigh the interests of a boxer against a commercial entity.  As Judge Lynch recognized when he was a member of this Court, while it is the boxer who walks into the ring to engage in physical combat, "[f]or everyone else, all that is at stake is money."

*Star Boxing, Inc. v. Tarver*, No. 02-CV-8446 (GEL), 2002 WL 31867729, at *6 (S.D.N.Y. Dec. 20, 2002).  The record is clear that although this rematch is of singular importance to Oquendo, there is no evidence that enforcing the provision is of comparable significance to Terek.  Nor does anything the Court is asked to do today constrain Terek's ability to solicit other boxing clients and earn revenues from them.

In concluding that the balance of hardships weighs in Oquendo's favor, the Court has considered Terek's argument that the interests of third parties may be affected by an injunction, most significantly Chagaev.[17]  For that reason, the Court explicitly asked for post-trial briefing on this issue.  *See* Dkt. 81.  Notwithstanding its insistence that Chagaev's interests must be protected, however, Terek has adduced no evidence whatsoever with respect to the impact of an injunction on Chagaev.  As his promoter, Terek—through Dugazaev—was plainly in a position to speak to what that impact might be.[18]  In these circumstances, Oquendo is entitled to an adverse inference that Chagaev's interests would not be materially injured by an injunction.  *See Martinelli v. Bridgeport Roman Catholic Diocesan Corp.*, 196 F.3d 409, 432, n. 10 (2d Cir. 1999) (adverse inference permitted against a party failing to call a witness "when the witness's testimony would be material and the witness is peculiarly within the control of that party") (quotation omitted);

---

[17] The Court has also considered Terek's argument that Chagaev should have been joined as a necessary party.  Under Fed. R. Civ. P. 19, "[t]he burden is on the party raising the defense to show that the person who was not joined is needed for a just adjudication."  7 Federal Practice & Procedure § 1609 (Westlaw 2015); *accord Greenwich Life Settlements, Inc. v. ViaSource Funding Grp., LLC*, 742 F. Supp. 2d 446, 455 (S.D.N.Y. 2010).  "If the initial assessment reveals the possibility that an unjoined party is required to be joined under Rule 19, the burden shifts to the opposing party to negate this conclusion." *United States v. Sweeny*, 418 F. Supp. 2d 492, 499 (S.D.N.Y. 2006) (citation omitted).  Other than its conclusory assertion that Chagaev must be joined, Terek has advanced no theory of why that is so.  Accordingly, this contention cannot succeed.

[18] Terek appears to have a promotional agreement with Chagaev at least through his next bout, since it has taken steps to promote a fight between Chagaev and Pianeta.  *See* Plf.'s Ex. 29.  The only evidence on the record with respect to the nature of that promotional relationship comes from Oquendo's expert witness.  Goodman testified—without challenge—that it is "highly unusual for a promoter to cede the right to choose his fighter's opponent" and that "as a matter of custom and practice in the industry, the promoter must have final decision-making rights" as to the choice of opponent.  Goodman Decl. ¶¶ 13, 15.

*Chevron Corp. v. Donziger*, 974 F. Supp. 2d 362, 700 (S.D.N.Y. 2014) (adverse inference "equally permissible in bench trials") (*citing Adelson v. Hananel*, 652 F.3d 75, 87 (1st Cir. 2011)).[19]

Furthermore, with respect to third parties other than Chagaev, Terek has advanced no explicit theory as to why the WBA or other boxers who have pending bouts with Chagaev would be negatively impacted by the injunction.  Although some of these boxers may have entered into contracts to fight Chagaev—and may wish to fight the new champion as soon as possible—these boxers were presumably aware of this well-publicized litigation and took steps to protect their interests.

With respect to the last factor, there is no reason an injunction in these circumstances would disserve the public interest.  Accordingly, the Court is satisfied that an injunction of 18 months provides an effective remedy for Oquendo's irreparable harm and does not unfairly burden Terek.[20]

---

[19] The Court has also considered Oquendo's alternative argument that he is an entitled to an adverse inference with respect to the impact of injunctive relief on third parties as a remedy for Terek's failure to comply with discovery obligations.  As Oquendo reasonably asserts, "the failure to produce responsive documents deprived Plaintiff of a fair opportunity to counter Defendant's (unsupported) claim that the rights of third parties would be negatively impacted by the requested injunction."  Plf.'s Resp. to Def.'s Obj. to R&R at 1, Dkt. 98.  Accordingly, and having considered Terek's objections to Judge Francis' R&R and found them unavailing, the Court adopts the R&R.  As suggested by Judge Francis, the Court will narrow its remedy to affording Oquendo an adverse inference that injunctive relief in his favor will not impact the rights of third parties.

[20] In *Lewis*, Judge Cedarbaum concluded that an injunction for 18 months "provide[d] an effective remedy" against the fighter's irreparable harm, 147 F. Supp. 2d at 237, and this Court accepts that approach.  However, as the Court did not invite submissions from the parties on the duration of the injunction, it is willing to revisit the term of the injunction if the circumstances warrant.

The Court also notes that the fact that the rematch did not take place within 120 days of the bout is not controlling here.  "[T]he rule of equity is that time of performance will not be considered of the essence of the contract unless it affirmatively appears that the parties regarded it as a material consideration."  *Lusker v. Tannen*, 90 A.D.2d 118, 124 (N.Y. App. Div. 1st Dep't 1982).  While the parties considered time in drafting the rematch clause, there is no reason to conclude that 120 days had some special meaning.  Rather, as the Court noted above, Wirt's principal objective in drafting the clause was to secure a rematch before Chagaev fought anyone else.  Significantly, Chagaev has not fought anyone since his bout with Oquendo, and thus it is still possible for Terek to honor its promise.

**F.      The WBA Resolutions Are Not Controlling**

Finally, in reliance on *Ruiz v. Sauerland Event GmbH*, 801 F. Supp. 2d 118 (S.D.N.Y. 2010), Terek also argues that Oquendo is barred from litigating this matter in this Court because the WBA's prior resolutions concerning the bout have preclusive effect under the doctrine of collateral estoppel.  This argument fails.

*Ruiz* involved a dispute between a boxer and a promoter concerning responsibility for withholding taxes for the boxer's purse and, specifically, whether the promised purse amount was net or exclusive of those taxes.  The promoter had won the right to promote the fight after winning in an auction process conducted pursuant to WBA rules, which included a provision stating in relevant part that "[t]he purse shall be NET without any deduction of any kind."  *Ruiz*, 801 F. Supp. 2d at 121.  The contract between the promoter and the WBA also provided that the "German tax issue [is] to be decided by [the] WBA."  *Id.* (alteration in original).

When the promoter in Ruiz challenged the WBA's interpretation of the bid rule, the court rejected that argument, holding that "[c]ourts generally defer to a private organization's interpretation of its rules in the absence of bad faith or illegality."  *Id.* at 125; *see also M'Baye v. World Boxing Ass'n*, 429 F.Supp.2d 660, 667 (S.D.N.Y. 2006).  The court then further determined that the WBA's decision was "binding" on the promoter and that it was "barred from attempting to relitigate the issues already raised and decided by the WBA."  *Id.* at 125–26.

Even assuming that the decisions of a private organization like the WBA can have preclusive effect under the doctrine of collateral estoppel, the facts here are plainly distinguishable. Although it is true that the WBA in its December 3 resolution rejected Oquendo's request to enforce the "rematch clause," that fact is legally irrelevant in this action.  Oquendo is not asking this Court (or the WBA for that matter) to enforce any kind of promise made pursuant to WBA

rules. Rather, the promise he seeks enforced is one made under New York law. In any event, this Court's decision does not tread on the WBA's prerogatives—at least not directly[21]—because Oquendo is not asking this Court to enforce the rematch clause against the WBA. Rather, he seeks enforcement against Terek—and Terek alone.

## CONCLUSION

For the foregoing reasons, the Court finds for Oquendo on both claims. He is entitled to judgment in the amount of $775,000 plus interest from July 7, 2014 through the date of judgment at the applicable statutory rate of 9 percent. *See* N.Y. C.P.L.R. §§ 5001–5004. The Court will concurrently with this opinion enter a permanent injunction enjoining Terek from promoting any bout for Chagaev within the next 18 months unless it first schedules the promised rematch.[22] The Clerk of Court is directed to enter judgment accordingly.

SO ORDERED.

Dated:    May 22, 2015
          New York, New York

Ronnie Abrams
United States District Judge

---

[21] It is true that the practical value of the rematch clause hinges on the WBA's sanction of any rematch. But its rules against enforcement of rematch clauses notwithstanding, the WBA has made exceptions and has sanctioned rematch fights when they were promised in a contract to which it was not privy. Tr. 42, 46. Here, Wirt testified without challenge that the WBA's leadership assured him—after the December 3, 2014 WBA resolution declining to enforce the rematch clause—that the organization would be willing to sanction an Oquendo-Chagaev bout if this Court found the rematch provision in the July Contract was enforceable. Tr. 345–46.

[22] After entry of judgment, the Court will also convert its earlier preliminary anti-suit injunction to a permanent injunction.